### KNOTT *v.* UNITED STATES (No. 1938).[1]

1. CONSTRUCTION, PARAGRAPH 81, TARIFF ACT OF 1913—"PLATES * * * OF CARBON."

The provision in paragraph 81, tariff act of 1913, for "plates * * * composed wholly or in chief value of carbon," should, in view of the fact that the provisions of the paragraph associated with it relate plainly to articles of electrical use and construction, be limited in application to carbon plates as known and used in those arts and industries, and should not be extended so as to include all flat and relatively thin slabs of carbon whatsoever.

2. CARBON BLOCKS—CARBON PLATES—CARBON BRUSHES—MATERIAL—MANUFAC-TURE.

Merchandise invoiced as carbon blocks consisting of carbon which has been molded into rectangular pieces, running in size from $1\frac{9}{16}$ to $8\frac{1}{4}$ inches in length, from $1\frac{1}{2}$ to $3\frac{5}{8}$ inches in width, and from three-sixteenths to $1\frac{5}{8}$ inches in thickness, was shown to be devoted, by means of considerable further processing, to the manufacture of brushes and plates for electrical machinery. Since they are so far advanced as to be appropriated to a particular use, they must be regarded as manufactures, but, since they may not be put to that use until after substantial further manufacturing processes, they can not be regarded as the finished articles. They are accordingly classifiable under paragraph 81, tariff act of 1913, as "manufactures of carbon not specifically provided for," and not as brushes or plates of carbon.

United States Court of Customs Appeals, February 25, 1919.

APPEAL from Board of United States General Appraisers, Abstract 42483.

[Reversed.]

*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellant.
*Bert Hanson,* Assistant Attorney General (*Samuel Isenschmid,* special attorney, of counsel), for the United States.

[Oral argument Jan. 15, 1919, by Mr. Tompkins and Mr. Isenschmid.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise in this case consists of carbon which has been molded into rectangular pieces, running in size from $1\frac{9}{16}$ to $8\frac{1}{4}$ inches in length, from $1\frac{1}{2}$ to $3\frac{5}{8}$ inches in width, and from three-sixteenths to $1\frac{5}{8}$ inches in thickness. These were invoiced by the importer as carbon blocks.

The appraiser in his advisory classifications described some of the articles as carbon brushes and some as carbon plates, and returned them for duty as such at the rate of 25 per cent ad valorem under paragraph 81, tariff act of 1913.

One of the appraiser's reports reads as follows:

The merchandise in question consists of rough carbon plates. When cut to size and shape these plates become finished dynamo brushes used in the production of electric light, heat, and power. They were returned for duty as carbon plates at 25 per cent ad valorem under paragraph 81, act of 1913.

---

[1] T. D. 37948 (36 Treas., Dec., 236).

There are five other reports of the appraiser, which are forwarded with the original papers in the case, but are not printed in the present record. These are all alike in substance, the following one therefore is copied as expressive of all:

The merchandise in question consists of rough carbon plates. When cut to size and shape these plates become finished dynamo brushes used in the production of electric light, heat, and power. They were returned for duty as carbon brushes at 25 per cent ad valorem under paragraph 81, act of 1913. They should have been returned for duty as carbon plates at the same rate of duty under the same paragraph.

In accordance with the advisory returns of the appraiser the collector assessed the merchandise with duty at the rate of 25 per cent ad valorem, as either carbon brushes or carbon plates, under paragraph 81, tariff act of 1913.

The following is a copy of the paragraph cited:

81. Earthy or mineral substances wholly or partially manufactured and articles and wares composed wholly or in chief value of earthy or mineral substances, not specially provided for in this section, whether susceptible of decoration or not, if not decorated in any manner. 20 per centum ad valorem; if decorated, 25 per centum ad valorem; unmanufactured carbon, not specially provided for in this section, 15 per centum ad valorem; electrodes for electric furnaces, electrolytic and battery purposes, brushes, plates, and disks, all the foregoing composed wholly or in chief value of carbon, 25 per centum ad valorem; manufactures of carbon not specially provided for in this section, 20 per centum ad valorem.

The importer protested against the assessment, claiming that the articles were not in fact brushes or plates, and that properly they should be assessed at the rate of 20 per cent ad valorem as "manufactures of carbon not specially provided for," under the last classification contained in the same paragraph. Other claims were presented by the protests, but they are now withdrawn.

The protests were submitted upon exhibits and oral evidence to the Board of General Appraisers. The board held that the evidence was insufficient to establish the proper classification of the articles; they therefore overruled the protests without approving the collector's assessment. The importer appeals from this decision.

Three witnesses testified at the trial before the board, all of whom were officers of the Morgan Crucible Co. That company is a domestic manufacturer of carbon brushes and plates, and the present articles were imported for its account. The testimony of the witnesses is not inherently improbable, and is uncontradicted in the record.

It appears from the testimony that the articles in question are produced by the foreign manufacturer from gas-house carbon and artificial graphite, combined with a small percentage of other ingredients which bear no relation to the present question. These substances are first ground to the form of powder; this is mixed with some kind of a binder; and this material while yet in a plastic state is put into dies, and molded into rectangular pieces or blocks by means of great hydraulic pressure. The pieces are then taken

from the dies, and are baked in a furnace. A trade-mark indicating the composition or quality of the materials employed appears upon each piece. Nothing more is done to them before they are exported to this country.

It appears from the testimony that the foreign manufacturer is prepared to produce these articles in a great variety of dimensions, there being hundreds of dies of various sizes which are thus employed. The required sizes and relative dimensions are of course specified by the importer in the orders sent abroad for the merchandise.

According to the testimony the articles when thus imported are not suitable for immediate use as brushes or plates, and do not in fact pass under those names, but after their arrival here they are subjected to substantial manufacturing processes whereby they are finished or converted into such articles. About 99 per cent of them are used in making brushes, some become elevator contacts which serve a purpose very similar to that of brushes, some become resistance plates.

The following testimony of Mr. Hardy, one of the witnesses, covers this point:

Q. (By Mr. TOMPKINS.) Please explain to the general appraiser the different stages of manufacture in making carbon blocks like the Exhibit 1 into carbon brushes.—A. In the first place, we take these blocks; the first operation is to cut them, then grind them to the necessary size. These (Exhibit 1) are imported in the rough state anywhere within one-tenth of an inch of its finished state, and is ground to four one-thousandths of an inch before it is a piece of material that will be useful for a brush. The third operation is to chamfer the edges.

Q. What does that operation consist of?—A. The first operation is to cut them into pieces. This block (one of the larger pieces) may make four or five as the case may be according to the finished product necessary.

Mr. MULVANEY. We have seven different sizes here, all marked "Exhibit 1."

Q. You say you cut them into four or five pieces?—A. As the case may be, according to the size necessary to make the brush we are about to make. That is the first operation. The second operation is to grind them on all six sides.

Q. How long does that take? Is that done by one machine?—A. This operation is done by one machine, by one operation. The third operation is to chamfer them to take off the sharp corners. The fourth operation is to check them to the size of the brush, to see if the brush grinder has made them the exact size of the brush, to see if they are within 0.004 of an inch when finished. The fifth operation is to mark the grade; that is, those samples, Exhibit A, some go up as far as the third operation before we get the completed article; others will be five, according to the style we are making.

\*     \*     \*     \*     \*     \*     \*

Q. What is the difference in value between articles recognized in trade as carbon brushes and the carbon blocks like the Exhibit 1?—A. What would be the cost of the machining?

Q. Approximately in percentage terms does it enhance the value of the imported article Exhibit 1?—A. Roughly, I should say 60 to 70 per cent.

\*     \*     \*     \*     \*     \*     \*

Q. (By Mr. TOMPKINS.) You say the Morgan Crucible Co. manufactures plates like the illustrative Exhibit B?—A. Yes, sir.

Q. Please explain the steps or stages of manufacture in making carbon plates—or, first, do you manufacture carbon plates out of carbon blocks like the Exhibit 1?—A. Yes.

Q. Please explain to the general appraiser the steps or stages of manufacture.—A. Very similar to the manufacture of the brushes. Cutting, grinding—we do not chamfer those edges; it is not necessary; but they have to be cut, ground, gauged, marked for grade, and those cross recesses put on for resistance purposes.

Q. Are those cross recesses put on for resistance purposes on all carbon plates turned out by you?—A. Yes.

Q. What is the difference in value between the articles you sell as carbon plates and carbon blocks like the Exhibit 1?—A. About the same.

Q. About 60 per cent?—A. About 60 per cent.

It appears, therefore, from the testimony, that articles like the importations are almost always imported in block dimensions, which after importation are subdivided into pieces approximating the finished articles in size, and this is the process described as the cutting of the imported blocks by the domestic manufacturer. After the imported pieces are thus cut into smaller sizes these are subjected to the various finishing processes described by the witness in the foregoing testimony. It is said by the witness that about 95 per cent of the importations after their arrival in this country are actually cut into lesser pieces in this manner, and as we understand the testimony all of the pieces in any given consignment might be thus treated in ordinary course. This would depend upon the orders received by the domestic company for the finished articles.

The following testimony of the same witness treats further of this subject:

Q. You are familiar with the way in which these things are imported, are you not?—A. Yes, sir.

Q. How are they ordered?—A. In sizes, certain quantities of sizes and grades that we wish them to supply.

Q. They are ordered according to specifications?—A. Yes, which we know the company has dies for.

Q. In other words, when you place an order you specify the size and grade of the article you want?—A. That is right.

Q. And also the exact quantity?—A. We specify the quantity; yes.

Q. How do you determine what size to order?—A. By using my experience. I determine which is the most economical block for cutting purposes, to cut into various size brushes which we have orders for in this country.

Q. For which you have orders in this country?—A. Or which we are likely to get orders for, because these are made to order, and according to my experience I can determine which is the most economical block to order.

Q. Is it not a fact you frequently have orders for brushes before you place your order for the articles imported?—A. Very, very seldom. Only in cases where there is a new grade coming out which we do not carry in this country.

Q. Does each and every item in these invoices correspond to an order placed by you?—A. By me; yes.

Q. A separate order?—A. Separate order.

Q. When you specify the grade in your orders you have in mind certain uses of the article, do you not?—A. I have in mind the orders that we are likely to get. In other

words, I have to keep my stock in New York in such shape that will take care of any orders that are likely to come in.

Q. What do the letters L, B, signify on your orders?—A. Our own orders on the factory. It changes each year. At the present time it is B. Each year we change the letter. L, attached in front of it, signifies that the order went to London.

Q. I believe you said that the manufacturer has many molds in which these articles were made?—A. Yes.

Q. About how many has he in all?—A. Approximately, I should think, a thousand.

Q. All different sizes?—A. Yes; some of them are to take care of special shapes. Of these plain, rectangular sizes, probably 400 to 500, I suppose, approximately, about.

Q. What use are these exhibits put to—Exhibit 1?—A. Cut up into the various size brushes that we have orders for.

Q. You said they were used for making brushes, did you?—A. Yes.

Q. Have they any other use?—A. Elevator contacts, which is a very similar purpose to a brush, and we use them for resistance plates; that is about the only use. The principle use we put them to is for brushes.

Q. What are the brushes used for?—A. For electric motors of all kinds.

Q. What function do they perform?—A. To carry the electricity from or to the machine, whichever the case may be.

Q. Used, then, as a conductor of the electric current?—A. That's right.

\* \* \* \* \* \* \*

Q. Now, in placing your orders for the articles in question you do specify the size with a certain degree of accuracy, do you not?—A. We specify the normal size.

Q. The what?—A. What we call a normal size, a size which will cut up into brushes economically, various numbers of brushes. It would not make any difference, because we always allow so much for cutting and grinding.

\* \* \* \* \* \* \*

Q. Of the whole number of carbon blocks like the Exhibit 1 which your company uses to make brushes, what percentage is in cut form?—A. Taking it for a period of a year, which is the only fair way to answer that question, I should say probably no more than 5 or 6 per cent are not cut; the others are all cut.

Accepting the foregoing testimony as correct we think that the importations in question are certainly manufactures of carbon, but that they are merely the bulk or block material from which brushes or plates may be manufactured, and are not themselves either carbon brushes or carbon plates. They can neither be sold nor used as such articles, and they do not attain to the name or character of either of them until after substantial alterations in size and condition are effected by means of domestic processing.

In the case of Fenton *v.* United States (1 Ct. Cust. Appls., 529, 534; T. D. 31546) this court, in passing upon a manufacture of cork which was designed for fishing-tackle floats, but not yet finished into such articles, said:

Assuming the foregoing decisions of the Supreme Court furnish an outline for a rule enabling us to determine what is a manufacture, it follows, we think, both upon reason and authority, that when merchandise, as in this instance cork bark in its crude state, has been subjected to manipulations which have reduced it to a form and shape so that it can only be used in the manufacture of floats, which is clearly a definite purpose, it has become a manufactured article, and is a manufacture of cork. It is no longer cork in its crude state, but has been so manipulated that it is the finished product of

one manufacture and is ready for the next in rank, namely, the manufacture of floats. Whether it has taken on a new name is not essential; it is only adapted to one use, and the evidence leaves it perfectly clear that it has yet to be subjected to, and is now ready to undergo and receive, the different operations and combinations that are required to make it into floats.

See also In re Blumenthal (51 Fed., 76).

This conclusion is not inconsistent with that reached by this court in the case of United States v. Foscati (6 Ct. Cust. Appls., 15; T. D. 35251). In that case the merchandise was certain small prismoidal pieces of glass, some of which were gilded, and others colored yellow, green, blue, orange, and maroon, *known by the special name of glass mosaics*, and ready to be used in making mosaic designs or pictures, with the exception that they must be cut to fit and must be ground smooth if the completed work were intended to be viewed at close range. The court held these articles to be dutiable under the tariff provision for "all articles of every description, * * * composed wholly or in chief value of glass." The present articles are likewise concededly articles composed wholly or in chief value of carbon, but they have not yet reached the name or estate of carbon brushes or carbon plates.

It is claimed by the Government that since the imported articles are flat and relatively thin in shape, they should at least be held to be plates of carbon, under the common and dictionary definitions of that term. It will be observed that the appraiser also inclined to this view, for in most of his reports upon the merchandise he stated that the articles should have been assessed as plates rather than as brushes, the rate of duty being the same for both classifications. We think, however, that the term "carbon plates" as used in paragraph 81, supra, relating as the provisions plainly do to articles of electrical use and construction, should be limited in application to carbon plates as known and used in those arts and industries and should not be extended so as to include all flat and relatively thin slabs of carbon whatsoever.

The testimony discloses that the present articles do not respond to this requirement. For before they become completed plates they must not only be cut or ground to size, or both cut and ground, but they must also be perfectly flattened, and recessed or corrugated, and in fact they must be more fully wrought in order to fit them for use as carbon plates in electrical construction than to fit them for use as carbon brushes in such work. This appears in part from the testimony above quoted and in part from the exhibits in the case. We do not believe, therefore, that the mere flat and comparatively thin form of the present articles, taken alone, is sufficient to bring them within the classification of carbon plates, as intended by the statutes.

In this view of the case we think that the protest of the importer should have been sustained upon the claim that the importations

were dutiable at 20 per cent ad valorem as manufactures of carbon not specially provided for, rather than at 25 per cent as carbon brushes or carbon plates.

It is true as stated by the board that the carbon articles enumerated in paragraph 81, supra, are technical in character, and that the terms used therein must be understood according to the trade, occupation, or art with which the paragraph is concerned. But on the other hand, the issue in this case does not depend upon proof of commercial designation, since a certain measure of acquaintance with such terms as electrical carbon brushes and plates may rightfully be presumed to be within the general information or common knowledge of the ordinary or average person in the community. Accordingly these terms are given a place in the standard dictionaries of the language. The following definitions are given:

Century Dictionary. (1911):

*Brush.*—One of the ends of the stationary circuit of an electric machine which receive the current from or supply it to the revolving circuit; so called because they had formerly a brushlike structure. Now the "brushes" are solid blocks of carbon or graphite, or packages of wire gauze or of metal leaves. The part of the revolving circuit with which the brushes make contact is called the *commutator* or *collector*.

The Standard Dictionary (1909):

*Brush.*—* * * *Elec.* (a) A strip of metal, bundle of wire, or bunch of slit metal plates, bearing on the commutator cylinder of a dynamo, and carrying off the current.
*Plate.*—* * * *Elec.* An element of a voltaic cell, or one of the condensing bodies in a condenser.

The definition of a brush last above given covers only such as are made of metal, but the use of the article is indicated, and the definition may therefore be extended to cover brushes made of carbon. The common knowledge regarding these articles and their ordinary names, supplemented by the testimony in the record relating to trade processes and usages, is sufficient, we think, to sustain the conclusion at which we have arrived.

The decision of the board overruling the protest is reversed, and the claim of the protest is sustained as above indicated.

*Reversed.*