## (C. D. 1448)

### MORGANITE, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 16, 1952)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the plaintiff.
*Charles J. Wagner,* Acting Assistant Attorney General (*William J. Vitale,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: The merchandise involved herein is invoiced as "Morganite strips for trolley inserts." It was classified by the collector at 15 per centum ad valorem under the provisions of paragraph 216 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802. The plaintiff claims that the merchandise is dutiable under the same paragraph at the rate of 12½ per centum ad valorem.

The paragraph of the Tariff Act of 1930 and the amendment thereto by the General Agreement on Tariffs and Trade, T. D. 51802, so far as pertinent herein, provide as follows:

PAR. 216. \* \* \* brushes, of whatever material composed, and wholly or partly manufactured, for electric motors, generators, or other electrical machines or appliances; plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes;

and articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for, 45 per centum ad valorem.

PAR. 216. Brushes, of whatever material composed, and wholly or partly manufactured, for electric motors, generators, or other electrical machines or appliances; plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes_____ 12½% ad val.

Articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for_____ 15% ad val.

Until paragraph 216, *supra*, was first amended by the trade agreement with the United Kingdom, T. D. 49753, the duty applicable to brushes, of whatever material composed, for use with electrical machines or appliances was the same as that applicable to the catch-all portion of said paragraph. Although admitting that the imported merchandise consists of articles or wares composed wholly or in part of carbon or graphite, it is the contention of plaintiff that the more specific provision of the paragraph is that providing for either brushes, partly manufactured for electrical appliances, or rods or other forms for manufacturing into such brushes.

The imported merchandise is represented by exhibit 1. It consists of a rod or rectangular strip slightly more than 9 inches long, 1 inch wide, and ¾ inch thick, having the center of one surface of the strip grooved, the groove being circular in form, about ½ inch wide and ⅛ inch deep at its deepest portion. The completed article, marked in evidence as illustrative exhibit 2, which the evidence shows to be ready for use, represents only a portion of the rectangular strip shown by exhibit 1. It is 2⅞ inches long on the ungrooved portion. The grooved surface is 2½ inches long. The ends, about ¼ inch up from the ungrooved surface, slant toward the center at about a 45-degree angle. The sides of the article are slightly bowed so that instead of being an inch wide they become ¾ of an inch in width. The article is recognizable, however, as having been formed from a portion of exhibit 1.

Illustrative exhibit 3 consists of a pamphlet entitled "Traction News," page 6 thereof being the portion marked in evidence. The pamphlet is a description of trolley coaches which obtain their power from overhead wires. The illustration marked in evidence shows the end of the trolley pole, noted on the illustration in ink as "C." Attached to the end is a terminal piece to which a line is attached and also the contact which rests upon the electric wire. This terminal piece is marked in ink with the letter "B." The part shown to be in contact with the electric wire is marked in ink with the letter "A."

Exhibit 4 is a letter on the stationery of the National Electrical Manufacturers Association, written by the standards publications editor. It reads as follows:

In the forthcoming "NEMA Standards for Brushes for Electrical Machines," Publication No. CB1–1951, "brush" is defined as follows:

A brush, as used in the electrical manufacturing industry, is a conductor, usually composed in part of some form of the element carbon, serving to maintain an electrical connection between stationary and moving parts of a machine or apparatus.

This was approved as an Adopted Standard by the Codes and Standards Committee of NEMA on August 10, 1949.

Exhibit A, admitted in evidence on behalf of the Government, is a National Electrical Manufacturers Association publication of July 1943, entitled "Carbon, Graphite and Metal-Graphite Brush Standards." The pamphlet identifies all sorts of brushes used for electrical contacts and standardizes the dimensions thereof. On page 8, a "brush" is defined as:

A brush is a carbon, graphite, metal-graphite or metal material used on rotating equipment for the passage of current between the rotating and the stationary members.

Thereafter, the three classifications of brushes are given, first, the industrial brushes; second, the fractional horsepower brushes; and, third, the automotive brushes. The pamphlet does not contain a description of the article at issue in this case.

The plaintiff's only witness, Louis A. Heath, testified that he was the manager of the technical department of the importer herein since 1917 and was familiar with these Morganite strips which are used for trolley inserts. He stated that the material is principally carbon with a binder. After importation, each strip is cut into three sections and put into a kiln. Thereafter, it is impregnated with a babbitt and finally machined into the oval-shaped article represented by illustrative exhibit 2. The witness testified that it is then known as an insert. The purpose of the article, according to the witness, is to act as a conductor of current from the trolley wire down through the pole. The witness stated that an analogous situation occurred in connection with electric trains where a contact shoe transmits electric current from the rail through the shoe into the engine which is applied to the electric motors, and that such shoe takes the electric current from the third rail in the same manner as the piece of carbon, illustrative exhibit 2, takes current from the overhead trolley wire. The witness further stated that as to the imported merchandise it was not commercially practicable to use it for any other purpose than to make articles like illustrative exhibit 2.

The witness described the term "brush" as used in the electrical industry as follows:

By brush is meant the conductor that makes contact between a moving part of electrical apparatus and the stationary part. It serves the function of conducting the current otherwise from a stationary part to a moving element of the motor, generator, or other apparatus.

In the opinion of the witness, that definition of "brush" would apply to an article such as illustrative exhibit 2. When read the definition of a "brush" in Webster's New International Dictionary of the English Language, 2d edition, unabridged, 1943, the witness agreed therewith. Such dictionary meaning given the word "brush" appears therein as follows:

Brush, 7, electric: One of two or more plates, rods, or bundles of strips, wire, gauze, etc., of some conducting material, especially copper or carbon, bearing against a commutator, collector ring, or slip ring, and providing a passage for the electric current from a dynamo through an outside circuit, or for an external current through a motor; *also, a similar device on some electric trains for picking up the current from the live rail.* [Italics not quoted.]

As a member of the technical committee of the carbon section which was instrumental in the formation of the definition of a "brush," as appearing in exhibit 4, the witness was of the opinion that such dictionary definition was the understanding of the electrical industry. On cross-examination, he was asked to read the definition of a "brush" in the publication admitted in evidence as defendant's exhibit A. The witness, when asked if he agreed with that definition, stated that substantially it agreed with his statement that a brush was a conductor of electricity between a moving part and a stationary part. The witness acknowledged that the completed article was used on a trolley bus which had a motor and that the motor also had a brush between the moving part and the stationary part of the motor which was similar, except for the shape, to the imported article.

The witness further testified that electricity is conducted from the wire down the pole to the stationary part of the motor and from such stationary part of the motor, it is conducted through the means of a brush to the moving part of the motor. When used in this connection, according to the witness, it is on rotating equipment for the passage of current between the rotating and the stationary member, while on the trolley pole there is not a rotating member, but the witness described it as a sliding contact. In the opinion of the witness, the function was the same as the transfer of current from the trolley car wire through the carbon to the trolley car as the transference of the current from the stationary to the rotating part of a trolley car motor, and that, in both cases, it was a sliding contact. The witness was of the opinion that the contact made by means of the

carbon is not the same as the contact of an electric plug attached to an electric iron, as there is a difference in the manner in which the electric current is picked up. However, the witness admitted that when electricity passes from the stationary member to the rotating member, the current brings about an electromagnetic force, but when the current is taken from the wire to the pole, there is no immediate bringing about at that point of electromagnetic force.

It is plaintiff's contention that when Congress provided for brushes for electrical machines or appliances, other than electric motors or generators, it intended to provide for brushes to cover any kind of apparatus wherein a brush might be utilized to transfer current. Inasmuch as the common dictionary meaning of an "appliance" is "a piece of apparatus," it would include such a device as a trolley pole upon which a brush is used to transfer current from a trolley wire down to the trolley motor in the same manner as a similar device is used on electric trains for picking up the current from the live rail.

Counsel for the Government contends that the imported article is not a brush nor is it used for manufacturing into brushes such as are provided for in paragraph 216, *supra*; that the ultimate use to which the merchandise is devoted is as carbon contacts, not brushes; that a brush must be used on rotating equipment for the passage of current between the rotating and the stationary member, according to the definitions of a "brush"; and that the trolley inserts for which the merchandise is imported are not within the common or the commercial understanding of the term "brush."

Government counsel cites the case of *Knott* v. *United States*, 9 Ct. Cust. Appls. 93, T. D. 37948, where carbon blocks were shown after considerable further processing to be devoted to the manufacture of brushes and plates for electrical machinery. That case involved paragraph 81 of the Tariff Act of 1913 providing a duty of 25 per centum ad valorem for brushes, plates, and disks, composed wholly or in chief value of carbon, and also a duty of 20 per centum ad valorem for manufactures of carbon, not specially provided for. The plaintiff had contended that the articles were dutiable as manufactures of carbon at the 20 per centum rate, whereas the collector had assessed the articles for duty at the 25 per centum rate under the same paragraph as brushes or plates. The case was tried before the Board of General Appraisers which held that the evidence was insufficient to warrant a reversal of the collector's action. Upon appeal, the court stated that "The testimony of the witnesses is not inherently improbable, and is uncontradicted in the record." Then the court reviewed the testimony of the three witnesses. One witness stated that the imported articles were cut up into various sizes of brushes; that they were used for elevator contacts, which was a very similar purpose to a

brush; and that they were also used as resistance plates, but that the principal use was for brushes for electric motors of all kinds to carry the electricity from or to the machine as a conductor of the electric current. The court found from such evidence that the imported merchandise was a manufacture of carbon, was merely the bulk or block material from which brushes or plates may be manufactured, and was neither carbon brushes nor carbon plates. Respecting the technical aspects of said paragraph 81 and the manner in which the terms therein may be construed, the court stated:

> It is true as stated by the board that the carbon articles enumerated in paragraph 81, supra, are technical in character, and that the terms used therein must be understood according to the trade, occupation, or art with which the paragraph is concerned. But on the other hand, the issue in this case does not depend upon proof of commercial designation, since a certain measure of acquaintance with such terms as electrical carbon brushes and plates may rightfully be presumed to be within the general information or common knowledge of the ordinary or average person in the community.

> \*      \*      \*      \*      \*      \*      \*

> \* \* \* The common knowledge regarding these articles and their ordinary names, supplemented by the testimony in the record relating to trade processes and usages, is sufficient, we think, to sustain the conclusion at which we have arrived.

> The decision of the board overruling the protest is reversed, and the claim of the protest is sustained as above indicated.

The foregoing decision is not an authority for holding that the articles in question should be relegated to the catch-all portion of paragraph 216, *supra*, inasmuch as the provision in the Tariff Act of 1930, as amended, provides particularly for articles to be manufactured into brushes. The court indicated in that case, however, that the technical materials covered by the paragraph there involved were intended to be understood or referred to according to their ordinary names and to the common knowledge of the average person in the community, supplemented by the testimony in the record therein relating to trade processes and usages.

The evidence before the court in this case tends to show that technically the merchandise in question does not come within the meaning of the term "brush" as it was understood in the technical trade as shown by the National Electrical Manufacturers Association publication of July 1943. In that publication, brushes were limited to such articles as were used on rotating equipment for the passage of current between the rotating and the stationary member. It was not until the year 1949 that the definition was enlarged to include articles serving to maintain an electrical connection between stationary and moving parts of an apparatus.

The Tariff Act of 1930 was first amended by the trade agreement between the United States and the United Kingdom on January 1, 1939, T. D. 49753, so that brushes and materials for the manufacture of brushes in paragraph 216, *supra*, were assessed for duty at a rate different from that provided for the catch-all portion of the paragraph. Should the technical definitions become the guide for the assessment of duty upon such articles, we would be obliged to hold that the merchandise here imported is not brushes within the meaning of the prevailing terms.

In the *Knott* case, *supra*, the court, although acknowledging the technical character of the carbon articles, relied upon their ordinary names. Webster's New International Dictionary, 1930 edition, defines brushes for electrical purposes in the identical language used in the 1943 edition. The common meaning of the term "brush" at the time when brushes were made dutiable at a different rate than appears in the Tariff Act of 1930, as well as in the year 1943, would include plates or rods of carbon used to provide a passage for an electrical current such as would pick up current from a live rail. Such common meaning, in the opinion of the court, is sufficiently broad to include plates or rods of carbon used to provide a passage for an electric current such as would also pick up current from a live wire, as in the case at bar. Such common meaning of the term is strengthened by the technical definitions of the term "brush," now prevailing, as a conductor of electricity between a moving part and a stationary part.

For the reasons stated, judgment will be entered in favor of the plaintiff directing that the collector reliquidate the entry and assess duty under the provisions of paragraph 216, as amended, *supra*, at the rate of 12½ per centum ad valorem, as forms for manufacturing into brushes for electrical appliances, and refund all duties taken in excess in accordance with law.