(C. D. 400)

AMERICAN MACHINE & METALS, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 19, 1940)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the **plaintiff**.
*Webster J. Oliver*, Assistant Attorney General, for the defendant.

Brown, Judge: This is a motion for rehearing filed by the Government in the above-entitled case the decision in which was rendered on August 19, 1940, and reported as C. D. 373, 5 Cust. Ct. 79.

It raises questions of more vital consequence and importance than the issues joined by the parties and presented by their briefs in the case itself which is sought to be reheard.

The assertions now made in support of this motion go to the extreme extent of claiming that an amendment made to the tariff law by executive action in furtherance of the operation of the trade agreement plan, by changing the language of the congressional act of 1930, differs entirely, in its legal purpose and effect, from an identical amendment of the law, in exactly the same language, made by the federal legislature itself in an act of Congress.

In the latter, of course, the new congressional amendment becomes an integral part of the tariff law treated as a whole and the ordinary rules of statutory construction apply to an importation embraced within its terms, and classification of such article is had, on contest before this court, to determine whether the importation is covered more narrowly or specifically by the new congressional amendment or *by any other paragraph of the tariff law* the language of which also embraces the imported article.

That comparison as to which of two paragraphs covers more narrowly and specifically an article embraced by the language of both is the basis of our entire classification jurisdiction.

To judicially decide these contested classifications is the most important of the purposes for which this tribunal was created in 1890.

The contention is that when a new amendment, in new language, is made to the tariff act by this executive trade agreement process no such comparison can be made with other paragraphs of the tariff act to determine which more narrowly covers a particular imported article, i. e., that the ordinary judicial review fails and is inoperative to that extent.

The exercise of our ordinary classification jurisdiction, in such circumstances, is claimed to be prevented by what the Government calls the *identification of the existing tariff status of an article*, which, arising out of the treaty negotiations, thus limits this court's judicial power.

The new issue, thus belatedly raised on motion for rehearing, presents a novel issue of first impression, the very great importance of which cannot be exaggerated or overemphasized. It is probably as important as affecting the customs taxpayers' long-established right to judicial review of administrative action as was the issue of delega-

tion of power in *Hampton* v. *United States*, 276 U. S. 394, or the expansion of that issue in *United States* v. *Fox River Butter Co.*, 20 C. C. P. A. 38, T. D. 45675.

It is undoubtedly true that, in spite of the Supreme Court's failure to grant certiorari in the *Fox River Butter Co.* case, which avoided decision on the merits, the question of the right to use new language by executive action in framing amendments to the Tariff Law under these new "Flexible Tariffs" must be taken as established in deciding the issue before us.

It is hard to imagine, however, why the same rules of statutory construction should not apply to new language thus inserted in a tariff act by executive action as apply to new language inserted in a tariff act by Congress itself.

The new delegations accomplish what Congress itself formerly accomplished by an ordinary act. Indeed, they are sustained upon the theory that, in fact, Congress itself is really acting through an executive agent. If so their legal effect must be exactly the same as if they had been embodied in an ordinary act of Congress.

The article in question was classified under paragraph 228 (a), Tariff Act of 1930, reading as follows:

PAR. 228. (a) Spectrographs, spectrometers, spectroscopes, refractometers, saccharimeters, colorimeters, prism-binoculars, cathetometers, interferometers, haemacytometers, polarimeters, polariscopes, photometers, ophthalmoscopes, slit lamps, corneal microscopes, optical measuring or optical testing instruments, testing or recording instruments for ophthalmological purposes, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, 60 per centum ad valorem.

(b) Azimuth mirrors, parabolic or mangin mirrors for searchlight reflectors, mirrors for optical, dental, or surgical purposes, photographic or projection lenses, sextants, octants, opera or field glasses (not prism binoculars), telescopes, microscopes, all optical instruments, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, not specially provided for, 45 per centum ad valorem.

Paragraph 353, which the Swiss Trade Agreement (T. D. 48093, 69 Treas. Dec. 74) modifies, reads as follows:

PAR. 353. All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

The provision of the Swiss Trade Agreement purporting to amend paragraph 353 reads as follows:

| Tariff Act of 1930 paragraph | Description of articles | Rate of duty |
|---|---|---|
| * * * | * * * * * * * | * * * |
| * * * | * * * * * * * | * * * |
| * * * | * * * * * * * | * * * |
| 353_____ | Testing machines for determining the strength of materials or articles in tension, compression, torsion, or shear, having as an essential feature an electrical element or device, and parts thereof; any of the foregoing, finished or unfinished, wholly or in chief value of metal, and not specially provided for. | 20% ad val. |
| 353_____ | Steam boilers operating with water under forced circulation at a rate of circulation at least eight times the rate of evaporation, and having combustion chambers designed for a working pressure exceeding 30 pounds absolute to the square inch, having as an essential feature an electrical element or device, and parts thereof; any of the foregoing, finished or unfinished, wholly or in chief value of metal, and not specially provided for. | 20% ad val. |

The effect of the amendment was to change the language of paragraph 353 so as to make the complete paragraph as changed read as follows:

PAR. 353. All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

*Testing machines for determining the strength of materials or articles in tension, compression, torsion, or shear,* having as an essential feature an electrical element or device, and parts thereof; any of the foregoing, finished or unfinished, wholly or in chief value of metal, and not specially provided for, twenty per centum ad valorem.

*Steam boilers operating with water under forced circulation at a rate of circulation at least eight times the rate of evaporation, and having combustion chambers designed for a working pressure exceeding 30 pounds absolute to the square inch,* having as an essential feature an electrical element or device, and parts thereof; any of the foregoing, finished or unfinished, wholly or in chief value of metal, and not specially provided for, twenty per centum ad valorem.

The underscored portion is the new trade agreement language.

When the new language was inserted, by executive action, into paragraph 353 those new words only went into paragraph 353, not into some other paragraph.

That is the significance of the marginal statement in all these executive agreements referring at the top to "Tariff Act of 1930 paragraph" and in the immediate margin giving its number.

But that is not to say that this affected no other paragraph. When new words are legislated into a tariff act they, of course, must go into some particular paragraph, either cutting down its scope or (as here)

enlarging its scope. Thus here, by specific description, they bring into it articles which were not in it before, necessarily transferring them to it from some other paragraph.

This is all included in the right of the executive to classify by adding new language as held in the *Fox River Butter* case, 20 C. C. P. A. 38, T. D. 45675, and *United States* v. *Sears, Roebuck & Co.*, 20 C. C. P. A. 295, T. D. 46086, which rulings the Supreme Court declined, for reasons satisfactory to itself, to review by certiorari.

With the contention of the Acting Assistant Attorney General as expressed in his brief that the marginal reference to paragraph numbers is an executive declaration that only paragraph 353 is affected and prevents a decision before this court as to whether the Presidential newly constructed paragraph is, or is not, more or less specific as to this article than paragraph 228 (a) (under which it was formerly classified) we are unable to agree. That would hamstring and destroy to a considerable extent the citizen's right to a judicial review before this court. No such thing was intended by Congress in instituting this executive agreement program.

There is not a word in the statute itself nor any fair inference from the language used in establishing this plan, from which any limitation of the judicial review can possibly be implied and no necessity whatever for creating such an untoward result from the operation of the executive agreement plan.

Congress did not have the question of judicial review in mind at all in setting up this plan for changing the rates, and the language, of the Tariff Act by executive action.

It is true that by analogy to the Flexible Tariff the operation of the *internal* executive process, the reasons and motives for a change, or the executive consideration of facts or the weighing of the evidence before him which lead the President's mind to adopt the change, are not subject to judicial review or correction, as recently held by the Supreme Court in *United States* v. *Bush & Co.*, 310 U. S. 371, decided May 20, 1940.

But that has absolutely nothing to do with the judicial review of the classification before this court of the administrative action in deciding whether the newly constructed executive paragraph more specifically covers a particular importation than some other congressional paragraph of the tariff act.

Indeed the Government's contention would be ruinous to the customs taxpayer's right to judicial review existing since the foundation of the Government.

There is nothing whatever in the trade agreement plan or in its practical operation to warrant any such revolutionary holding as the Acting Assistant Attorney General contends for.

Previous to the Flexible Tariff (of which the trade agreement plan is only a variant form, with the purpose of reduction instead of increase) new language could not have been inserted into a paragraph of a tariff act except by act of Congress. Had Congress itself inserted into paragraph 353 the new language used here, it, of course, would have only amended that paragraph. At the same time it would have rendered paragraph 353 narrower, and more specific, as applied to this article before us, than the language of paragraph 228 (a), i. e., changed the legal classification of this article from paragraph 228 (a) to paragraph 353. On the language actually used that could not have been avoided. It is impossible to say that a different consequence must ensue when identical language is inserted by the treaty negotiators.

If the mere making of a marginal entry by the executive treaty negotiators under the heading at the top reading—

Tariff Act of 1930 paragraph

of the figure 353, the statutory paragraph number, produces a different result, as claimed on motion for retrial by the Assistant Attorney General, then a very remarkable result emerges. Those operators of this new executive power perform an act which Mr. Justice Cardozo describes in *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, at page 305, as a —

delegation, though a permissible one, of the legislative process.

They also exercise judicial power belonging only to the courts.

For giving the purpose of the marginal notation the effect claimed, it means that the courts shall not construe the new words inserted into paragraph 353 in the same way they would have construed them had Congress itself inserted them in a new act.

Thus the settled rules of construction are all cast aside and the negotiators intent, not expressed by the language of the amendment, not to include in paragraph 353 any article not heretofore contained in it, is held to control although the new words inserted therein, by every rule of statutory construction, plainly bring this article under paragraph 353 for the first time.

It seems impossible to suppose that Congress intended to grant any such judicial power to the treaty negotiators in establishing this trade agreement plan.

And if the right to classify embodied in that plan did express such an intention it is difficult to see how the right to delegate any such power to executive hands can be constitutional.

This goes further than the Court of Appeals went in their ruling in *United States* v. *Fox River Butter Co.*, *supra*, in that it delegates, in effect, judicial power, as well as legislative power, to executive hands.

The *Fox River Butter Co.* case never went to the Supreme Court because certiorari was denied. Such denial does not pass upon the

merits, which was the question of the power to write in new language, there involved. *United States v. Carver*, 260 U. S. 482, 490. *Atlantic Coast Railroad Co. v. Powe, Administrator*, 283 U. S. 401, 403. *Magnum Import Co., Inc. v. Coty*, 262 U. S. 159, 163.

Presumably the Supreme Court's position on tariff delegation stands to this effect (1) That the Flexible Tariff was constitutional because the process did not delegate legislation, *Hampton v. United States*, 276 U. S. 394; (2) The *internal* flexible process is not justiciable because it is a *legislative process. United States v. Bush & Co.*, 310 U. S. 371. None of this, however, involves the question of delegating *judicial power*.

As every statute must be interpreted, if possible, as conforming to the constitution we hold that Congress never intended by the trade agreement plan to restrict the judicial power in any way and that, therefore, the same rules of statutory construction are to be applied to the new language of paragraphs rewritten by the trade negotiators as would be applied if they had been rewritten by a new act of Congress.

Consequently, if right in our construction that the newly written paragraph 353 more specifically covers the article, whose classification is before us, than paragraph 228 (a), it must now be classified under said paragraph 353. That is our holding here. We further hold that the marginal notation of statutory paragraph numbers indicates only what statutory paragraphs are being changed in their language or rates, the power to alter the congressional statutory language being assumed to be legal.

If it had not been for the Court of Appeals holding in *United States v. Fox River Butter Co.*, 20 C. C. P. A. 38, *supra*, this question would not have arisen. Without that holding it would have been generally assumed that the trade agreement plan was intended only to lower existing statutory *rates* of duty *without changing the congressional language* which latter necessarily involves comparison with other paragraphs of the tariff act to determine which paragraph specifically covers a particular imported article.

If the changes had been limited to changes in rates, *without executive change of the congressional language*, the question before us could not have arisen.

It is plain, however, that it must frequently arise whenever, as here, new words are inserted by executive action under this plan.

It is also plain that new words inserted must have exactly the same legal effect as if Congress itself had inserted them and the legal determination must be had before this court as to whether the newly drawn treaty paragraph or some other paragraph more narrowly classifies any particular article which is covered by the language of

both paragraphs. This must be so whether the new language was inserted by Congress or by the executive.

It would be impossible to hold that identical new words would have one effect if inserted by executive action and an entirely different effect if inserted by Congress itself.

Nor can the marginal references used by the treaty negotiators, to indicate merely in what statutory congressional paragraphs they are changing the rates, or the language, or both, possibly have such a remarkable and extraordinary effect.

The Assistant Attorney General points out (p. 12 of his brief) that products of Germany, which country has been proclaimed under the terms of the act as discriminating against our commerce, do not get the benefit under the favored-nation principle of reductions in treaties made with other countries, stating—

Thus, in the decision of the Court in this case articles similar to those involved in the instant case, if the product of Germany would be classified under paragraph 228 (a) but if the product of any other country would be classified under paragraph 353.

There is nothing anomalous or strange about that result as he claims. It is exactly what the express language of the trade agreement plan provides, namely that the discriminating country should receive no benefit whatever from the trade agreements from either reductions in rates of duty or changes in the statutory language made therein.

This case well illustrates the confusion likely to ensue from the holdings by our court of appeals[1] (so far unreversed) that the executive writing of new paragraphs, embodying entirely new language, into a congressional tariff act is not the exercise of legislative power which the constitution commits to Congress alone.

To fit such new language into a trade formula, whether based upon cost differences or upon trade benefits, so as to successfully argue that Congress actually did the writing itself, in advance, when it stated the so-called formula for delegation, is a tenuous mental operation, much more difficult than applying such theory to the mere calculation of a change in the amount of a rate of duty as in *Hampton* v. *United States*, 276 U. S. 394.

If the Acting Assistant Attorney General's *new* contention on this motion is sustained it would narrow into a small compass, and limit to a considerable extent, the beneficent purpose for which this trade agreement plan was established, as shown by the history of the times.

That announced purpose was to cut down, and ameliorate, the excessively high rates of the Hawley-Smoot Tariff of 1930, for the benefit of American consumers and the promotion of foreign trade, without the necessity of a general congressional tariff revision down-

---

[1] *United States* v. *Fox River Butter Co.*, 20 C. C. P. A. 38; *United States* v. *Harry Blandamer*, 20 C. C. P. A. 45; *United States* v. *S. Leon & Co.*, 20 C. C. P. A. 49; *United States* v. *Sears, Roebuck & Co.*, 20 C. C. P. A. 295,

ward. The favored-nation principle was incorporated into the statutory plan. It grants the reductions, made through reciprocity to one country, to all other nondiscriminating countries, whether they have trade agreements, or favored-nation commercial treaties, with us or not. It is outside and beyond the scope of reciprocity.

The other nondiscriminating countries receive the reductions without giving anything in return. Its purpose is general reduction of duties.

If, however, the insertion of new language into the act by the negotiators is to have a more limited legal effect than the same words would have if inserted by Congress, it is plain that these intended general reductions to other countries become limited in scope. Thus, to that extent, the incidental purpose for such general reductions fails of accomplishment.

Such a construction would be against the general purpose of the trade agreement statute as expressed in its own language. That is a conclusive legal reason for not adopting the Government's new contention.

This brings us to the Government's further contention that because the rate of duty found upon the proper judicial classification of this article is a reduction of more than 50 per centum of the duty paid, we cannot (according to the contention) classify the article at all, but must, instead, overrule the protest.

This difference in rate of more than 50 per centum was unfortunately overlooked in our decision, C. D. 373, partly because the Government did not refer to it until now, when moving for a retrial, and undoubtedly requires correction of our judgment to avoid that consequence.

That limitation in the statute, however, upon the executive power to change the law, was simply such a limitation of the amount of change and nothing more. It has no relation whatever to the judicial power we are exercising in construing the law and was not intended as a limitation upon that power. There is nothing whatever in the statutory language used in authorizing these trade agreements which points in that direction.

As the great John Marshall frequently said, a statute must be construed in a sensible way to make the statute work according to its manifest purpose.

The plaintiff here is in the position of a litigant who has only claimed, say $5,000 in his narr or declaration, yet the jury has awarded him more, say $6,000. He is limited legally to the amount he has claimed, $5,000, and judgment can and actually issues for that amount and no more.

Similarly here the plaintiff is suing for the return of an amount of money claimed to be due him as customs taxes illegally exacted.

The Customs Court has decided the classification which he claims in his protest is correct under paragraph 353 as amended by the President. The statute, however, steps in and says that the executive power to reduce duties and write new language into the act, which here has caused this plaintiff to win his case, must not result in a reduction of duty of more than 50 per centum.

The protest, therefore, should only be sustained to that extent.

The judgment should, therefore, be corrected by directing the collector to refund one-half of the duty taken.

As the duty taken upon the article at issue amounted in the two protests consolidated for trial to $1,281 if expressed in a money judgment form, the judgment would now, as corrected, direct the defendant to pay to the plaintiff the sum of $640.50.

Thus limited in conformity to the statute the rights of the plaintiff to procure a review of the administrative action involved, and have the court judicially determine the correct classification of his merchandise, remain intact, and the statute, with the limitation, is construed as a workable whole.

The judgment should be corrected to that end accordingly. The motion for a rehearing or retrial is denied.

### CONCURRING OPINION

KEEFE, Judge: I am in accord with my associate, Judge Brown, in denying the motion for rehearing herein. While I differ to some extent in my reasons therefor, I am completely in accord with his opinion that the trade agreements cannot be construed as delegating judicial power so as to limit the classification jurisdiction of the Customs Court. However, I do not agree with my associate that the judgment may be amended to limit the refund of duties so as to conform to the provisions of section 350 of the Trade Agreements Act, restricting executive decreases to 50 per centum. Consequently, I feel that it is necessary, in order to fully express my viewpoint, that a separate opinion be filed by me.

In this case, reported in C. D. 373, in which a motion for rehearing is before us, certain testing machines used for the purpose of testing the hardness, tensile strength, and compression of various metals, which contain within the apparatus a microscope by means of which the indenture made upon the metal is readily ascertained, were held classifiable as testing machines under the provisions of paragraph 353 of the Tariff Act of 1930, as amended by the reciprocal trade agreement with Switzerland.

The reasons set forth for the motion and in argument before us are principally that in rendering said decision this court overlooked the

extremely serious import resulting therefrom in relation to the nation's trade agreement progress, because it was the intent of the parties entering into the trade agreement not to transfer articles from paragraph 228 (a) to paragraph 353, and that such transfer would result in a reduction of duties of more than 50 per centum, which is in direct violation of section 350 of the Trade Agreements Act, and that therefore the rule of specificity would have no application to articles affected by trade agreements.

Upon consideration of the motion for rehearing, I have thoroughly examined the law and the effect of said decision upon the trade agreement in question. As I see it, the merchandise in question was ordinarily assessed for duty by the collector under the provisions of paragraph 353 prior to and at the time the trade agreement in question became effective, to wit, January 9, 1936. See *Bittner* v. *United States*, promulgated May 25, 1933, and reported in Abstract 24219. There the machine in question was particularly designed for testing the hardness of metals and contained an electric buzzer, electric light, and a battery which supplied illumination so as to enable the operator to inspect the impression made upon the metal through a microscope attached to the machine. The merchandise was classified by the collector under the provisions of paragraph 353. Upon appeal to this court, it was found that the machine was operated entirely by hand and the electric buzzer, electric light, and battery were not essential to the operation thereof. Therefore it was removed from classification under the provisions of paragraph 353 because it did not contain as an essential feature an electrical element or device and was therefore held dutiable as all other machines under paragraph 372.

The trade agreement entered into between the United States and Switzerland on January 9, 1936, among other things, added new language to paragraph 353 of the Tariff Act of 1930, specifically reducing the duty upon testing machines classifiable under said paragraph as follows:

| 353 | Testing machines for determining the strength of materials or articles in tension, compression, torsion, or shear, having as an essential feature an electrical element or device, and parts thereof; any of the foregoing, finished or unfinished, wholly or in chief value of metal, and not specially provided for. | 20 per centum ad valorem. |
|---|---|---|

Thereafter, on November 17, 1936, the Bureau of Customs in a letter notified the collector of a change in classification of testing machines containing microscopes, directing their removal from the provisions of paragraph 353 and advising classification under the provisions of paragraph 228 (a).

An importation was made on December 2, 1936, of a Firth hardometer the purpose of which was to test the hardness of materials by

pressure applied to a tool which penetrated the material to be tested, and the resulting indentation, being small, was read by the aid of a microscope fitted with a micrometer scale. In classifying the merchandise the collector, following the instructions in the aforesaid Bureau of Customs letter, determined that the microscope was firmly attached to the machine and was an essential part thereof. Consequently it was classified by the collector as an optical measuring instrument under paragraph 228 (a) of the Tariff Act of 1930 at the rate of 60 per centum ad valorem. The importer filed a protest against said classification, claiming that said hardometer was a machine and under the *Bittner* case, *supra*, was properly dutiable at 27½ per centum ad valorem under paragraph 372. See *Tinius Olsen Testing Machine Co.* v. *United States*, decided December 16, 1937, and reported in T. D. 49303. At the trial it was established that the machine in that case was used solely for the purpose of testing the hardness of metals; that the machine was operated by hand power; that after the specimen is marked there is a very slight indentation, hardly noticeable to the naked eye, and to determine the size of the indentation a microscope is used to identify the hardness number or type of the indentation; that the microscope is used to determine the reading and that any microscope could be used for that purpose; and that a microscope need not be a part of the equipment. Upon the evidence presented the court held that the testing machine weighing several hundred pounds was an optical measuring instrument by reason of the inclusion of the microscope, and therefore dutiable at 60 per centum ad valorem under paragraph 228 (a).

I am not in accord with the decision in the foregoing *Tinius Olsen* case, as it is not only contrary to all former classifications of the merchandise by the collector, but is contrary to former decisions of this court on the same type of article. In this connection it will be noted that an optical instrument has been defined by this court and the Court of Appeals in the following cases, and microscopes have been excluded from the definition thereof.

In the case of *Mueller* v. *United States*, G. A. 8130, T. D. 37509, certain cystoscopes, being instruments used by surgeons in making ocular examinations of the human bladder, and consisting of metal lenses, mirrors, and a small electric light adapted to light up the interior of the bladder, and convey an image thereof to the eye of the surgeon, were held to be neither optical instruments nor microscopes, and were determined to be dutiable according to the component material of chief value, the court stating—

The primary purpose of the instruments in question is not to aid vision—although incidentally to their use they do aid it—but to enable the surgeon to examine the bladder. They are not optical instruments but surgical instruments. One might almost as well call a gun with a telescopic sight an optical instrument, because incidental to its use the vision would be aided.

In the case of *Hardy & Co.* v. *United States*, Abstract 38900, 29 Treas. Dec. 671, certain Coddington loupes were classified as optical instruments and held dutiable as microscopes. The article consisted of a lens included in a shield of metal and then there was another piece of metal fastened to one side of it so that it closed over and protected both ends of the lens. It was proven that it was used to magnify anything looked at through it. In holding that the instrument did not come within the definition of "optical instrument" announced in *United States* v. *Bliss*, 6 Ct. Cust. Appls. 433, T. D. 35980, the court stated:

A microscope has certain properties and performs certain functions different from those of an optical instrument. It is designed to magnify objects, to bring them in closer relation to the sight. In so doing it is not performing the function of an optical instrument as we understand the term.

In the case of *United States* v. *Bliss, supra,* the Court of Appeals, in holding that certain azimuth mirrors, octants, and sextants were not optical instruments, enquired deeply into the common meaning of the term "optical instruments" and reviewed the law upon the subject and came to the conclusion that articles which present to the vision a desired mathematical conclusion which is expressed upon an instrument in degrees by means of light apply principles or laws discovered and established by prior investigation in the science of optics for the purpose of producing a result not optical but mathematical, viz, the measurement of an angle.

The ruling in the *Tinius Olsen* case, *supra,* was followed by the collector in classifying the testing machine here in question under paragraph 228 (a) as an optical measuring or optical testing instrument, because a microscope was a part of the machine.

A decision of this court or our appellate court is not necessarily binding in a new case involving a similar importation. The decision in the *Tinius Olsen* case having been promulgated long after the adoption of the trade agreement referred to surely could not have been considered at the time of the adoption of the trade agreement as part of the tariff laws. I prefer to follow previous decisions of the court and not be bound by the decision in that case. Especially is this true when the added language in paragraph 353 as a result of the trade agreement in question is so specific that it brings such merchandise directly under its provisions.

Counsel for the Government, with consummate skill and adroitness, moves for a rehearing upon the theory that the court in reaching its conclusion that the articles were properly dutiable under the provisions of paragraph 353, as amended by the trade agreement between the United States and Switzerland, has overlooked factors of far-reaching importance which, if taken into account, would result in a conclusion contrary to that reached by the court, inasmuch as the

concessions granted in said trade agreement did not include any intent to transfer articles from paragraph 228 (a) to paragraph 353, and that such transfer would result in a reduction of duties of more than 50 per centum in direct violation of section 350, and, therefore, the rule of specificity would have no application because the intent is otherwise expressed.

In other words, the contention of the Government that in pursuance of the power delegated by Congress to the President to raise or lower the rates of existing duties through the Trade Agreements Act, providing that proclamation shall not be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists, the holding of this court that the articles in question are properly classifiable under the provisions of paragraph 353 at 20 per centum ad valorem rather than under the provisions of paragraph 228 (a) at 60 per centum ad valorem, is without authority of law. That is to say, when the collector has classified any article under any paragraph of the law which bears a duty of more than 50 per centum higher or lower than a rate proclaimed in any trade agreement for any given article, the court is without jurisdiction to decide the proper classification thereof, insofar as it places the articles within the scope of the wording of the trade agreement for such article. The absurdity of such contention is at once apparent. At the time of the agreement between the United States and Switzerland, testing machines containing as an essential feature an electrical element or device and also containing a microscope to ascertain the results accomplished by the testing machine were regularly classified by the collector under the provisions of paragraph 353 at 35 per centum ad valorem. After the agreement had been entered into between the contracting parties, the collector, upon advice of the Bureau of Customs, changed the classification of a testing machine, not having as an essential feature an electrical element or device, but containing a microscope, from the provisions of paragraph 372 at 27½ per centum ad valorem as all other machines, to the provisions of paragraph 228 (a) as optical measuring or optical testing instruments at 60 per centum ad valorem. When the case came before this court for decision, notwithstanding evidence to the effect that the result of the test may be ascertained by any microscope not connected with the machine, and disregarding the fact that the machine was designed for the purpose of testing metals and was not designed as an optical measuring instrument, the court held the article to be dutiable as assessed by the collector. Now the Government is contending that, right or wrong, such decision must stand as authority for the collector's action in subsequent classifications involving merchandise containing a microscope as a part thereof. The Government has overlooked the fact, in the instant proceedings, that, at the time the

trade agreement was entered into, merchandise such as is now before us was properly classifiable by the collector under the provisions of paragraph 353. However, if such were not the case, I am of the opinion that, under the law, this court has the authority and the jurisdiction to reclassify merchandise the subject of trade agreement, when the evidence presented before this court establishes that such merchandise had been erroneously classified by the collector under a paragraph not within the scope of a trade agreement, even though a reclassification of such merchandise would result in a reduction of more than 50 per centum in duty. In so doing the agreement, which in no way affected the articles enumerated in paragraph 228 (a) of the act of 1930, is still not affected when merchandise erroneously classified under said paragraph is held classifiable under the paragraph the subject of trade agreement, because it was always properly classifiable thereunder.

The answer to the argument of the Government is, first, that when Congress writes a tariff act, or modifies an existing tariff act, before coming to an agreement upon the change of any schedules each item is carefully considered and debates held. After the passage of such an act, the collector classifies imported merchandise in accordance with his interpretation of the written law. The interpretation of the law by the collector in classifying merchandise thereunder is specially subject to review by a court of law, as granted by Congress in section 514 of the Tariff Act of 1930. In delegating its power to the President in the Trade Agreement Act to change rates, Congress delegated no more power than it retained for itself, and, therefore, classifications of the collector under any trade agreement are subject to the same review before customs tribunals as classifications made pursuant to changes made by Congress in the tariff act itself. Second, that if the Government's contention is sound, the Secretary of the Treasury has no more authority to order the collectors of customs to change the classification of any merchandise previously classified under a paragraph which had been changed by the enactment of a trade agreement than the court would have to reclassify the merchandise. Metal testers, having as an essential feature an electric element or device, and containing an electric buzzer and battery, which was necessary to throw a light on a microscope attached to the machine in order that the operator might inspect the impression, were classified by the collector under paragraph 353 previous to the enactment of the trade agreement in question. Under the theory advanced by the Government such articles could not be removed by the collector from the provisions of paragraph 353, as amended by the trade agreement, even though it had been found that such articles had been improperly classified thereunder.

I am of the opinion that the merchandise before us is properly classifiable under the provisions of paragraph 353 of the Tariff Act of 1930

as well as the provisions of said paragraph as amended by the trade agreement between the United States and Switzerland.

I am not in accord with my associate's ruling that, because the rate of duty determined by the judicial classification of this article is a reduction of more than 50 per centum of the duty paid, we must of necessity limit the refund in duties to the plaintiff to 50 per centum. The trade agreement in question never purported to reduce the duty upon testing machines outside the range of the 50 per centum reduction, nor did it do so. However, the collector erroneously classified the merchandise under a paragraph bearing a duty of such high rate that the proper classification thereof, in effect, reduced the duty thereon to more than 50 per centum. Were it possible for the collector by classifying the same under other paragraphs of the law to discriminately raise duties upon merchandise coming within the language of reductions granted in trade agreements, without the power of the courts to review such findings and make refund of illegal assessments, it would be possible for the Treasury Department to defeat the entire trade agreements program. I am of the opinion that the plaintiff is entitled to judgment ordering the return of monies representing the difference between the assessment of duty of 60 per centum ad valorem and 20 per centum ad valorem.

I therefore join with Judge Brown in overruling the motion of Government counsel for a rehearing.