(C. D. 1573)

MORGANITE, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided December 30, 1953)

John D. Rode (Ellsworth F. Qualey of counsel) for the plaintiff.
Warren E. Burger, Assistant Attorney General (William J. Vitale, special attorney), for the defendant.

Before EKWALL, JOHNSON, and FORD, Judges; JOHNSON, J., dissenting

EKWALL, Judge: Plaintiff herein imported at the port of New York 129 bags of carbon powder upon which duty was assessed at the rate of 15 per centum ad valorem under the provision in paragraph 216 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (T. D. 51802), for "articles or wares composed wholly or in part of carbon * * * , wholly or partly manufactured, not specially provided for." It is claimed by plaintiff that the merchandise is properly dutiable at 12½ per centum ad valorem under the provision in the same paragraph which enumerates—

Brushes, of whatever material composed, and wholly or partly manufactured, for electric motors, generators, or other electrical machines or appliances; plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes * * *.

Specifically, plaintiff claims that the language applicable to this importation is "other forms," as above described. It is contended that this language is not limited to other forms which are similar to plates and rods.

In support of this claim, there was introduced the testimony of one witness, the technical manager of the importer, who testified substantially as follows: It is his duty to supervise the processing of this carbon powder, after importation, in plaintiff's plant. He described the material in its condition, as imported, as follows:

It is a combination of various carbons, graphites, with various types of binders consisting primarily of tars, pitches, which in the processing will form the hard, compact block from which brushes are cut.

The invoice covers three types of powder which are similar but differ in composition. The witness described the processing of the imported carbon powder after importation and produced samples of articles in the form of hard, compact blocks, obtained as a result of such processing. He stated that said blocks are used for the ultimate manufacture of carbon brushes, which brushes are used as electrical contacts on rotating equipment.

In a determination of the issue as thus presented, we will resort first to the fundamental rule of construction, i. e., to ascertain and give

effect to the intention of the enacting body. Was it its intention that the term "other forms," as found in the modification of paragraph 216, *supra*, should include the carbon powder here involved?

Recourse to the Summary of Tariff Information, 1948, part 1, volume 2, page 226, reveals that the provision in said paragraph for "articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for," was understood by said Tariff Commission to include carbon powder for making electrical brushes. In the first paragraph under the heading "Comment" on page 226, we find the following:

This summary covers (1) a large group of carbon and graphite articles and wares n. s. p. f. and (2) bulk calcined petroleum coke. The first group is composed for the most part of small articles having relatively high unit values; among the more important are filter blocks, carbon light filaments, graphite molds, graphite packing and gaskets, *carbon powder for making electrical brushes*, and telephone, radio, and hearing-aid specialty parts of carbon. [Italics supplied.]

\*        \*        \*        \*        \*        \*        \*

In the Geneva agreement the rate of duty on products covered by this summary was reduced from 30 percent to 15 percent ad valorem.

In the President's proclamation modifying certain rates of duty pursuant to the General Agreement on Tariffs and Trade (T. D. 51802), here involved, we find the following:

WHEREAS (6) after seeking and obtaining information and advice with respect thereto from the United States Tariff Commission, the Departments of State, Agriculture, Commerce, the Army, and the Navy, and from other sources, on October 30, 1947 I entered, through my duly empowered Plenipotentiary, into a trade agreement with the Governments of the above-named countries, which trade agreement, consisting of the General Agreement on Tariffs and Trade including nine annexes and twenty schedules and the related Protocol of Provisional Application of the General Agreement on Tariffs and Trade, together with the Final Act Adopted at the Conclusion of the Second Session of the United Nations Conference on Trade and Employment which authenticated the texts of said general agreement and said protocol, which trade agreement is authentic in the English and French languages as indicated and is embodied in the document annexed to this proclamation;

\*        \*        \*        \*        \*        \*        \*

In view of the above statement that the President sought and obtained information and advice from the United States Tariff Commission, among other sources, clearly, he must have been cognizant of the interpretation placed by the Tariff Commission on the term "carbon powder for making electrical brushes" and understood it to fall within the general term "articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for."

That this interpretation was in effect at the time of the negotiation of the trade agreement between the United States and the United

Kingdom, January 1, 1939 (T. D. 49753), is evidenced by the "Digests of Trade Data with Respect to Products On which Concessions Were Granted By the United States," published by the Tariff Commission in connection with the trade agreement between the United States and the United Kingdom, page 2-63, under the heading "Manufactures of Carbon or Graphite, Not Specially Provided For," where we find the following under "Description and uses":

Articles and wares of carbon or graphite, other than lighting carbons, furnace and electrolytic electrodes, and brushes * * * consist of a great variety of articles such as: Dry battery filler and rods; carbon filter plates; *carbon powder*; ear specialties; telephone specialties (transmitter disks and diaphragms); dash pot plungers and packing rings (for steam turbines); carbon tubes and moulds, and graphite crucibles, retorts, stoppers and covers, for melting metals and alloys; and certain kinds of electrodes for batteries, etc. [Italics supplied.]

In the light of the above, a construction such as that contended for by the plaintiff herein would be contrary to the intent of the parties to the said General Agreement on Tariffs and Trade.

The description of the carbon powder here involved, as given by plaintiff's witness, is consistent with the collector's assessment as "articles or wares composed wholly or in part of carbon * * *, wholly or partly manufactured, not specially provided for," under said paragraph 216, *supra*.

The protest is, therefore, overruled and judgment will be rendered for the defendant.

### DISSENTING OPINION

JOHNSON, Judge: I regret that I am unable to agree with my associates that the carbon powder in question, established to have been dedicated to the use of manufacturing into the brushes provided for in paragraph 216, as amended, does not fall within that portion of paragraph 216, as amended, for "plates, rods, and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes." I am unable to perceive anything ambiguous about the phrase "and other forms * * * for manufacturing into the aforesaid brushes" which would cast a doubt as to whether or not it would include a form in the nature of a powder "for manufacturing into the aforesaid brushes," which, in my opinion, is the only ground upon which extraneous reports may be considered in reaching a conclusion.

Counsel for the plaintiff contends that the language used in the provision in question is not limited to other forms which are similar to plates and rods, for the reason that had Congress desired to so limit the provision it would have been a simple matter to have provided for "plates, rods and *similar* forms" rather than "*other* forms." [Italics not quoted.] Plaintiff's counsel points out that the word "powder" is defined in Webster's New International Dictionary,

2d edition, as "2. A preparation in the *form* of fine particles." [Italics not quoted.] It is argued, therefore, that *powder* would be commonly regarded as a *form* of carbon, and, thus, powdered carbon of the character imported, which was dedicated to the use of manufacturing into brushes for electrical machines or appliances, comes directly within the meaning of "and other forms" of carbon.

On behalf of the Government, counsel's only contention was that to come within the tariff description of "plates, rods, and other forms," an article must be one of those forms and that powder is not a form such as a plate or rod. It is argued by Government counsel in that connection that "powder" is one step behind the carbon block form which is the article used in producing electric brushes, and, therefore, such powder, being merely a preparation used in forming the block, is not within the description "and other forms." According to Government counsel, therefore, the powdered or granulated form of carbon, which is the raw material from which carbon plates, rods, or blocks are made, has not reached the "form" stage, as contemplated by the statute.

It should be noted here that neither counsel for the Government nor counsel for the importer alluded to the Summary of Tariff Information, 1948, nor mentioned that this court could do nothing other than approve the interpretation of the Tariff Commission as to the meaning of the language in the General Agreement on Tariffs and Trade, upon which my colleagues solely rely in reading out of paragraph 216 and amendments thereto, the words "and other forms."

It is not surprising, however, that the Government did not think it pertinent to advance any such novel theory, particularly in view of the fact that in the case of *American Machine & Metals, Inc.* v. *United States*, 5 Cust. Ct. 79, C. D. 373, such a theory was strenuously argued by Government counsel, but denied by this court, in a motion for a rehearing, *ibid.*, 5 Cust. Ct. 199, C. D. 400. In brief of Government counsel accompanying said motion, it was argued as follows:

Upon the facts found by the Court it apparently regarded the issue before it as one to be determined upon its interpretation of the relative specificity of paragraph 353, as modified by the Trade Agreement with Switzerland, and paragraph 228 (a) of the Tariff Act of 1930. But this overlooks factors of far-reaching importance which if taken into account would, it is submitted, necessarily result in a conclusion contrary to the that reached by the Court herein. The intent of the parties signatory to the Trade Agreement with Switzerland, and of the President in incorporating the concessions thereof into our tariff laws pursuant to Section 350 of the Tariff Act of 1930, as amended, did not include any intent in any case to transfer articles from paragraph 228 (a) to paragraph 353. * * *

     *       *       *       *       *       *       *

* * * the provisions of the trade agreements fully disclose what duties and import restrictions the President had found "required or appropriate" to proclaim.

The duties made effective by proclamation are specified in Schedules attached to and made a part of trade agreements. These schedules are the result of negotia-

tions between representatives of the United States and the foreign contracting government, and therefore express the intention of both parties. It goes without saying that the negotiators of an agreement have carefully considered each item in the schedule annexed to it, and that they intend to express in the schedule that which they have agreed upon. Before they can come to any agreement on any particular item, the negotiators must necessarily have some identified subject to agree upon. It follows that a commodity selected for discussion with a view to altering its existing tariff status must first be identified as to its existing tariff status. Moreover, tariff identification at the outset of negotiations is essential so far as the United States imports are concerned, in order to determine the extent of the concession to be granted, and also to insure compliance with the 50 percent statutory limitation with respect to changes in duty.

* * * And as the President proclaims the *agreement*, his proclamation neither enlarges nor delimits the scope of the concession granted as expressed in the agreement. * * * In other words, certain articles which were included in the general terms of paragraph 353 of the Tariff Act of 1930, were specifically selected, described and designated under item 353 of Schedule II of the Agreement as subject to the concession to Switzerland. * * * In so doing the Agreement in no way affected the articles enumerated in paragraph 228 (a) of the Act of 1930.

\* \* \* \* \* \* \*

Further manifestations of this intent that the concessions granted by the Swiss Trade Agreement be strictly confined to articles previously classified in the paragraphs identified by the numbers in the left hand margin of Schedule II of the Swiss Agreement is to be found throughout the official publication *"Concessions Granted By The United States In The Trade Agreement With Switzerland: Digests of Trade Data Respecting The Products Affected By The Concessions,"* issued by the United States Tariff Commission (1936), * * *. [Italics quoted.]

Counsel for the Government concluded that the omission of paragraph 228 (a) from such digests is a conclusive indication of the absence of intent on behalf of the signers of the trade agreement to include any articles falling within that paragraph in the concessions granted as to paragraphs 353, 360, and 372; and that, inasmuch as testing machines with optical features were not included in the concessions granted to Switzerland with respect to other testing machines, such machines with optical features were excluded. In language of counsel for the Government in that case—"insofar as the subject matter of United States concessions are concerned, the trade agreement schedules clearly express the maximum concession granted with respect to each item in the schedules. No rule of construction can therefore be applied which would extend the scope of a concession beyond that expressed in the agreement."

In answer to Government's counsel's contention, the court stated:

The contention is that when a new amendment, in new language, is made to the tariff act by this executive trade agreement process no such comparison can be made with other paragraphs of the tariff act to determine which more narrowly covers a particular imported article, i. e., that the ordinary judicial review fails and is inoperative to that extent.

*The exercise of our ordinary classification jurisdiction, in such circumstances, is claimed to be prevented by what the Government calls the identification of the existing*

*tariff status of an article, which, arising out of the treaty negotiations, thus limits this court's judicial power.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

\* \* \* the question of the right to use new language by executive action in framing amendments to the Tariff Law under these new "Flexible Tariffs" must be taken as established in deciding the issue before us.

It is hard to imagine, however, why the same rules of statutory construction should not apply to new language thus inserted in a tariff act by executive action as apply to new language inserted in a tariff act by Congress itself.

The new delegations accomplish what Congress itself formerly accomplished by an ordinary act. Indeed, they are sustained upon the theory that, in fact, Congress itself is really acting through an executive agent. If so their legal effect must be exactly the same as if they had been embodied in an ordinary act of Congress.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

When the new language was inserted, by executive action, into paragraph 353 those new words only went into paragraph 353, not into some other paragraph.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

But that is not to say that this affected no other paragraph. When new words are legislated into a tariff act they, of course, must go into some particular paragraph, either cutting down its scope or (as here) enlarging its scope. Thus here, by specific description, they bring into it articles which were not in it before, necessarily transferring them to it from some other paragraph.

This is all included in the right of the executive to classify by adding new language as held in the *Fox River Butter* case, 20 C. C. P. A. 38, T. D. 45675, and *United States* v. *Sears, Roebuck & Co.*, 20 C. C. P. A. 295, T. D. 46086, which rulings the Supreme Court declined, for reasons satisfactory to itself, to review by certiorari.

With the contention of the Acting Assistant Attorney General as expressed in his brief that the marginal reference to paragraph numbers is an executive declaration that only paragraph 353 is affected and prevents a decision before this court as to whether the Presidential newly constructed paragraph is, or is not, more or less specific as to this article than paragraph 228 (a) (under which it was formerly classified) we are unable to agree. That would hamstring and destroy to a considerable extent the citizen's right to a judicial review before this court. No such thing was intended by Congress in instituting this executive agreement program. [Italics not quoted.]

In a concurring opinion, Judge Keefe, my distinguished predecessor on this court, stated that he was completely in accord with the opinion that trade agreements cannot be construed as delegating judicial power so as to limit the classification jurisdiction of the Customs Court. Upon appeal to the Court of Customs and Patent Appeals, *United States* v. *American Machine & Metals, Inc.*, 29 C. C. P. A. (Customs) 137, C. A. D. 183, the issue as to the applicability of the most-favored-nation clause of said treaties between the United States and Great Britain, or of the generalization clause of the said Reciprocal Trade Agreements Act, was not even raised by the Government. The appellate court affirmed the decision of this court classifying the merchandise as testing machines.

My learned colleagues in the pending case accept, without question, definitions in the "Digest of Trade Data," above referred to, as fixing the classification of articles within the catchall provisions of the paragraph in question, although such articles come directly within the common understanding of the tariff term "other forms." My associates have deemed it necessary not only to refer to, but actually adopt, the Tariff Commission's comments upon the new rates under the General Agreement on Tariffs and Trade, as the judicial interpretation, upon the assumption that the President must have been cognizant of, and in agreement with, the interpretation which the Tariff Commission placed upon the term "carbon powder" at the time of the negotiations, thus relegating a form of carbon specially provided for the use of manufacturing into brushes for electric machines or appliances to the "not specially provided for" classification.

Moreover, it is pertinent to point out the fallacy of so interpreting the President's thoughts and intentions in the matter, and accepting interpretations of the Tariff Commission, without first considering whether or not the words under interpretation are of such ambiguous and doubtful meaning that interpretation thereof becomes necessary. My associates should have been cognizant, of course, of the fact that, in this controversy concerning the trade agreements provision under authority of section 350, Tariff Act of 1930, as amended, the provisions of section 336, concerning the equalization of costs of production findings by the Tariff Commission, are not involved, and that tariff terms involved in trade agreements may be judicially determined in the same manner as tariff terms found in the tariff act itself. What the President might or might not consider as covered by such terms used in the trade agreement is entirely immaterial. In that connection, note exceptions as to classification in the General Agreement on Tariffs and Trade, Annex I, Interpretative Notes, and Article I, paragraph 3, page 75 of the agreement, reading:

The following kinds of customs action, taken in accordance with established uniform procedures, would not be contrary to a general binding of margins of preference:

\*　　\*　　\*　　\*　　\*　　\*　　\*

(ii)　the classification of a particular product under a tariff item other than that under which importations of that product were classified on April 10, 1947, in cases in which the tariff law clearly contemplates that such product may be classified under more than one tariff item.

There are many cases before both this court and the appellate court involving trade agreements where the classification of merchandise, under particular paragraphs, as amended by trade agreements, was considered upon the basis of the present rules of construction of the tariff term.

The case of *United States* v. *Good Neighbor Imports, Inc.*, 33 C. C. P. A. (Customs) 91, C. A. D. 321, concerned the construction of the

term "cigarette cases," found only in the trade agreement entered into with the United Kingdom, as amending the general provisions of paragraph 1552 covering smokers' articles. The articles imported were boxes, measuring approximately 11 x 4 x 2 inches, having a hinged cover. The importer contended that the boxes came within the meaning of cases. In that action, this court, in a unanimous decision, refused to give effect to the "Digests of Trade Data with Respect to Products On which Concessions Were Granted By the United States," published by the United States Tariff Commission in connection with such trade agreement, wherein the Commission stated that the cases referred to were such as were carried on the person. The court held, therefore, that the boxes, as imported, which were not of the nature to be worn, were included in the term "cigarette cases" appearing in the trade agreement.

Upon appeal, the *appellate court found that a doubt existed as to the meaning of the term, "cigarette cases,"* employed in the trade agreement, and, in such circumstances, extraneous aids in the interpretation of the term, such as the Digests of Trade Data, should be employed, particularly after approving the common meaning of the word "case," as defined by the lexicographers, and pointing out the difference in the meaning of the word "box." For the reason that this court refused to consider such aids, the decision below was reversed, the court stating:

*It is apparent, however, that the words "cigarette cases" are not sufficient in and of themselves to determine the purpose of the legislation here involved, and that the term as employed in the trade agreement under consideration is ambiguous and doubtful.* Therefore, in order to give effect to the intent of the negotiators of the agreement, *it was* not only the right but also *the duty of the court below in the interpretation of the term to resort to extraneous aids if available under the established rules of evidence.* See *United States* v. *American Trucking Association*, 310 U. S. 534, 542.

The duty of the Tariff Commission in the trade agreements program according to published official documentation is to supply to the President and the departmental organization all information pertinent to imports into the United States of commodities which may be included in trade agreement negotiations. Section 4, act of June 12, 1934, 48 Stat. 943, 945, extended by Joint Resolution, 50 Stat. 24, approved March 1, 1937. [Italics not quoted.]

The Digests of Trade Data were quoted by the court, and it was found that such digests were pertinent to the issue to the extent that the court may take judicial knowledge thereof, although it is significant that the court also stated that *the information contained therein was not binding upon the court, even though it may be considered as bearing upon the identity of the merchandise under consideration.*

In the case of *Thorens, Inc.* v. *United States*, 31 C. C. P. A. (Customs) 125, C. A. D. 261, the importer relied upon a statement in the Digests of Trade Data prepared by the Tariff Commission relating to the provisions of the trade agreement with Switzerland, under which the

importer claimed classification of certain music boxes. The paragraph of the Tariff Act of 1930, before amendment by the trade agreement, provided for musical instruments and parts thereof, not specially provided for. By amendment there was added to that paragraph, at a lower rate of duty, "Music boxes and parts, not specially provided for." However, this court disregarded the description in the Tariff Commission digest, reading in part:

Music boxes of the type considered here frequently have a container top or lid which may be used as a receptacle for powder puffs, jewelry, cigarettes, etc. * * *

Although the foregoing description would indicate that the music boxes contemplated by the parties to the agreement were other articles with a music box attachment, this court held that the articles imported were something more than music boxes, being actually toilet roll holders in combination with music boxes, and, irrespective of the description by the Tariff Commission, not within the common meaning of music boxes.

The appellate court, in affirming the decision of this court, stated:

*We do not find it necessary to consider this publication of the Tariff Commission for we find nothing ambiguous in the use of the term "music boxes"* as used in the trade agreement.

*       *       *       *       * .       *       *

We do not understand that appellant's counsel claims that the term is ambiguous, but merely that the publication shows that the makers of the trade agreement intended to include in such term such articles as are here involved.

It is elementary, as we have many times stated, that *where no doubt exists as to the meaning of a term, extraneous aids must not be resorted to, for there is no need of construction where no ambiguity exists.*

In the case of *Railroad Commission of Wisconsin et al.* v. *Chicago, Burlington & Quincy Railroad Co.*, 257 U. S. 563, the court said that extraneous aids "are only admissible to solve doubt and not to create it."

*In the case at bar even if the publication of the Tariff Commission be considered, it at most creates a doubt where none before existed with respect to the meaning of the term "music boxes."* [Italics not quoted.]

This latter case is particularly apropos to the question here presented. Here, also, if there be any doubt that the term "and other forms" includes carbon powder used for the purpose of manufacturing brushes, it is not the language of the tariff act, but the Tariff Commission, that has created such doubt. In both of the foregoing cases, the addition of "cigarette cases" and "music boxes" was new language, inserted by the parties to the trade agreement, to supplement the "not specially provided for" portions of the respective paragraphs, and the appellate court has not hesitated to disregard the Tariff Commission's definitions where it was found no doubt existed in the common meaning of the term.

As previously stated, the statute at issue in the pending case is not ambiguous. It is not new in the act. In fact, the tariff language at issue, "other forms * * * for manufacturing into the aforesaid brushes," appeared in the Tariff Act of 1922 and was reenacted, without change, in the Tariff Act of 1930. Brushes, plates, rods, and other forms were previously the subject of trade agreement between the United States and the United Kingdom, concluded November 17, 1938, where, for the first time, the rate appearing in the Tariff Act of 1930 was reduced from 45 per centum to 25 per centum as to brushes and plates, rods, and other forms, used to manufacture into brushes. The Digests of Trade Data there described articles and wares of carbon or graphite, other than brushes, to consist, among other things, of "carbon powder." In that description, the Tariff Commission did not restrict the carbon powder to such as is used "for making electrical brushes," nor did it indicate that the description, "carbon powder," was intended to include such powder as was used for making such brushes. That there are carbon powders other than such as are used for making electrical brushes, is a matter of judicial record. The case of *H. Robinson* v. *United States*, 10 Treas. Dec. 515, T. D. 26837, G. A. 6195, involved a powdered carbon, intended for use in the construction of dry batteries, which was held dutiable as articles or wares composed wholly or in chief value of carbon.

In the Summary of Tariff Information, 1929, on the Tariff Act of 1922, published by the United States Government Printing Office in 1929, and containing information before the Congress at the time of the passage of the Tariff Act of 1930, under the heading "ELECTRODES, BRUSHES, PLATES, DISKS," and the subheading "Description and uses," the tariff provisions for carbon brushes and plates, rods, and other forms, are described below, and it will be noted that there is no description of any article included within the terms "or other forms":

Carbon brushes are small pieces of carbon which convey electrical current to or from revolving parts of machines by bearing against the revolving surface. The greater number of the articles classed as carbon *plates*, disks, and specialties are used for electrical equipment, some of the more important of which are granulated carbon and disks for telephones, battery carbons, carbon contacts, and packing rings. [Italics not quoted.]

With the definitions of the Tariff Commission before it, the Congress reenacted paragraph 216 of the Tariff Act of 1922 as paragraph 216, Tariff Act of 1930, without change, including the term "and other forms." There was nothing in the Tariff Commission's summary which would exclude either carbon plates, disks, or another form— "powder"—all used exclusively for manufacturing into brushes, from the tariff description of "and other forms * * * for manufacturing into the aforesaid brushes."

Inasmuch, therefore, as it is evident that no ambiguity exists in the provision for brushes for electrical machines or appliances, and plates, rods, and other forms, for manufacturing into such brushes, extraneous aids, such as descriptions by the Tariff Commission in interpretation of the terms, are neither necessary nor required.

Rather than my associates relying upon the purported intention of the President in approving the General Agreement on Tariffs and Trade, as though they were dealing with an issue under the flexible tariff provisions of section 336, it might be well to consider the settled rules touching the interpretation of tariff statutes.

It has long been held that the presence of the term "not otherwise specially provided for" in a given paragraph advises the customs authorities that merchandise otherwise within the paragraph may be elsewhere classified. If two provisions were equally applicable to merchandise, the presence in the one and the absence in the other of that term would determine its classification. See *Hall* v. *United States*, 131 Fed. 648, T. D. 25340, affirmed in *Hall* v. *United States*, 136 Fed. 774, T. D. 26122.

In the case of *Hirschberg et al.* v. *United States*, 7 Ct. Cust. Appls. 40, T. D. 36307, the Court of Customs Appeals reversed this court relative to the classification of carbons for electric lighting covered by a paragraph in an earlier act, correlative to paragraph 216, as amended, as to the specificity of the clauses in said paragraph, one of which was restricted to such as was not specially provided for. The court stated:

The question presented is whether this latter clause [carbons for flaming arc lamps, not specially provided for in this section, * * * ] is to replace the provision for carbons for electric lighting if composed chiefly of lampblack or retort carbon at the specific rate of 40 cents per hundred feet under the present law. In other words, whether, in view of the presence of the limitation "not specially provided for in this section," carbons for flaming arc lamps are to be given controlling effect, or whether this clause is to be held restricted by this provision to such as are not provided for in the earlier portions of the paragraph. We think the latter construction the sound one. It is to be kept in mind that this is the working provision under which this identical material must have been classified under the act of 1909. It was reenacted in substantially the same terms, with the change of rate. It had therefore been again specially provided for in the act of 1913, and Congress, by inserting the provision restricting the particular provision for carbon for flaming arc lamps to such as are not specially provided for in the section, intended that such as were specially provided for would be controlled by the earlier provision, which was likewise present in the former tariff law.

Not only is it a settled rule of construction that the phrase "not specially provided for" is restrictive of a tariff provision, but it is also well settled that Congress is presumed to have intended to assess higher rates of duty on manufactured articles than on the raw ma-

terials from which such articles are made, *unless a contrary intent is evident from the statute*, such as in the classification of kidskins in the case of *Transport Co.* v. *United States*, 15 Ct. Cust. Appls. 89, T. D. 42159.

In the case of *United States* v. *American Shipping Co.*, 13 Ct. Cust. Appls. 346, T. D. 41254, respecting the classification of a raw material at a lower rate than an article manufactured therefrom, the court stated:

* * * *To require the classification of this merchandise, which is material for the manufacture of medicinal preparations*, under paragraph 61, at a duty of 40 cents per pound and 50 per centum ad valorem, *would bring about the anomalous position of assessing for duty a manufacturing material at a higher rate than the finished product*, which is dutiable at only 25 per centum ad valorem. *This result is not in harmony with the presumed intent of Congress*, and has been so frequently referred to in the decisions of courts as not to require extended citation. True enough, *Congress has the right to provide for a higher duty on materials for manufacture than it has provided for the finished product, but unless it is clear that it intended to do so this court will not require such classification, if by reasonable and proper interpretation it may be avoided.* [Italics not quoted.]

See also the case of *United States* v. *O. M. Baxter (Inc.)*, 16 Ct. Cust. Appls. 257, T. D. 42868, where the appellate court took into consideration the usual well-recognized legislative policy of assessing higher rates of duty on articles which are advanced by complicated manufacturing processes than the rates of duty applicable to the same articles in a less advanced state.

To construe the phrase "and other forms" as not including the form of "powder," when shown to have been dedicated to the manufacture of electric brushes for electrical machines, solely because the Tariff Commission stated that such article, so specifically provided for under the commonly known form of powder, was to be relegated to the "not specially provided for" section is, in my opinion, altering words in the tariff in the interest of imagined intent. Mr. Justice Holmes, in the case of *United States* v. *George Riggs & Co.*, 203 U. S. 136 (51 L. ed. 127), in that respect stated:

* * * You must not alter words in the interest of the imagined intent, and the importers are entitled to the benefit of even a doubt.

Again, in the case of *United States* v. *Wells, Fargo & Co.*, 1 Ct. Cust. Appls. 158, T. D. 31211, the appellate court stated:

The rule is based upon the sound principle that customs laws are drawn in view of the lay understanding (first) of the trade subject thereto, and (secondly) for the information of merchants and dealers who are not lawyers, and perchance may not be skilled in the finesse of the English language and who, with a common lay understanding, will be completely informed by the plain words of the statute as drawn by Congress what duties are levied and what penalties they may expect for a violation of the law.

*Taxes are never levied by implication, and we do not feel at liberty, except in accordance with higher authority, to ingraft upon a statute a meaning resting solely in*

*implication, rather than in the natural import of the expressed words as commonly accepted and understood by layman and merchant.* [Italics not quoted.]

Mr. Justice Story succinctly stated the rule in the case of *Adams et al.* v. *Bancroft* (1 Fed. Cases 84), as follows:

\* \* \* I may add in this connection, that *laws imposing duties are never construed beyond the natural import of the language; and duties are never imposed upon the citizens upon doubtful interpretations;* for every duty imposes a burden on the public at large, and is construed strictly, *and must be made out in a clear and determinate manner from the language of the statute.* [Italics not quoted.]

The foregoing decision was quoted with approval by the Supreme Court of the United States. See *Hartranft* v. *Wiegmann*, 121 U. S. 609, and cases therein cited.

It is my opinion that a combination of various carbons, graphites with various types of binders, into a powder which has no other use than manufacture into carbon blocks, which are to be cut up and machined into various shapes and sizes, as required for electrical brushes, comes squarely within the statutory terms "and other forms, of whatever material composed, and wholly or partly manufactured, for manufacturing into the aforesaid brushes," rather than within the catchall portion of such paragraph for "articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, *not specially provided for.*" [Italics not quoted.] In the case of *Morganite, Inc.* v. *United States*, 29 Cust. Ct. 76, C. D. 1448, certain strips for trolley inserts, assessed for duty under paragraph 216, as amended by the General Agreement on Tariffs and Trade, as articles or wares composed wholly or in part of carbon or graphite, wholly or partly manufactured, not specially provided for, were held classifiable as "plates, rods, and other forms" for manufacturing into the aforesaid brushes, this court there finding that the trolley inserts came within the definition of articles to be manufactured into brushes.

For the reasons stated, I am constrained to dissent.